315 Ga. 498
FINAL COPY


S22A0837.  CAMDEN COUNTY v. SWEATT et al.


MᶜMILLIAN, Justice.

Camden County (the "County") appeals the superior court's denial of its "Petition for Writ of Prohibition and Other Relief" concerning an order entered by Camden County Probate Judge Robert C. Sweatt, Jr., setting a special election for a referendum on whether resolutions authorizing the County's purchase of land for a rocket launch facility should be repealed (the "Referendum"). The County asserts that the Referendum was not authorized under subparagraph (b) (2) of Article IX, Section II, Paragraph I of the Georgia Constitution, which established home rule for counties in this state (the "Home Rule Paragraph")[1] and that the results of the Referendum are a nullity. As a result, the County argues that the superior court erred in denying its petition for writs of prohibition

---

[1] The full text of the Home Rule Paragraph is attached as Appendix I to this opinion.

and mandamus against Judge Sweatt and its petition for a judgment declaring that the Referendum was not authorized under the Constitution. We disagree and affirm for the reasons set forth below.[2]

The facts are undisputed. Beginning in 2015, the Board of Commissioners for Camden County, Georgia (the "Board") began making plans to build a commercial rocket launch facility (the "spaceport") in Camden County. On June 3, 2015, the Board approved the County's entry into an option agreement with Union Carbide Corporation (the "Option Agreement") for the purchase of certain land on which to build the spaceport and later approved amendments to the Option Agreement that apparently extended the length of the option period.[3] However, citizen opposition to the

---

[2] We are aided by helpful amicus curiae briefs filed by (1) Association County Commissioners of Georgia and (2) Ben Goff, Jacqueline Eichhorn, University of Georgia School of Law First Amendment Clinic, and the Georgia First Amendment Foundation. We thank them for their assistance.

[3] Although the amendments to the Option Agreement extending the option period are not in the record on appeal, the parties do not contest that the Option Agreement was extended several times.

2

project arose over time, and on December 14, 2021,[4] a number of registered electors in the County filed a petition under the Home Rule Paragraph in the Probate Court of Camden County (the "Electors' Petition") seeking a special election for a referendum on the issue of whether the Board's resolutions authorizing the Option Agreement and its extensions (the "Resolutions") should be repealed.

The County filed a caveat to the Electors' Petition alleging that the petitioners failed to meet the requirements of the Home Rule Paragraph because the filing contained a number of duplicate and inconsistent voter signatures, which brought the number of electors below the Home Rule Paragraph's requirement for obtaining a referendum. Judge Sweatt issued an order dismissing the caveat on February 8, 2022 (the "Caveat Order"), determining that there is no legal authority for filing an objection to a petition filed by electors

---

[4] That same day, two electors, James Goodman and Paul A. Harris, also filed suit in the Superior Court of Camden County to prevent the County from closing on the purchase of the land for the spaceport and obtained a temporary restraining order to that effect. However, the superior court later denied injunctive relief following an evidentiary hearing.

under the Home Rule Paragraph, and even if such authority existed, the County's caveat was not verified as required under Georgia law. See OCGA § 15-9-88 (In probate court, "[a]ll objections or caveats to an order sought shall be in writing and verified, setting forth the grounds of such caveat.").

That same day, February 8, 2022, Judge Sweatt also issued an order granting the Electors' Petition (the "Referendum Order"). The order determined that (1) the required number of verified electors had signed the petition; (2) the petition requested that the following question be put to the County's electors at a special election called pursuant to the Home Rule Paragraph:

> Shall the resolutions of the Board of Commissioners of Camden County, Georgia authorizing the Option Contract with Union Carbide Corporation and Camden County's right and option to purchase the property described therein be repealed[;]

and (3) the petition satisfied the requirements of the Home Rule Paragraph. Based on these findings, the order directed that a special election on the question would be held on March 8, 2022. The County did not attempt to appeal either the Referendum Order or the

4

Caveat Order.

However, prior to the special election, on February 24, 2022, the County filed a "Petition for Writ of Prohibition and Other Relief" in the Superior Court of Camden County against Judge Sweatt and also named James Goodman and Paul A. Harris, who had been among the electors to sign the Electors' Petition, as interested parties who may wish to intervene in the proceeding. The petition sought writs of prohibition and mandamus against Judge Sweatt, asserting that he had exceeded the probate court's jurisdiction in setting the special election. The petition also sought a declaratory judgment that the Electors' Petition was invalid, the Referendum Order was a nullity, and the Referendum was unauthorized, along with further declaratory relief to avoid consequences to the County arising from the Referendum. Goodman and Harris successfully moved to intervene in this action on February 25, 2022.[5] An expedited hearing was held on March 3, 2022, and the next day,

_____

[5] Goodman and Harris are hereinafter referred to collectively as the "Intervenor-Appellees."

March 4, the superior court issued a written order[6] summarily denying the County's petition.[7] On March 8, 2022, the Referendum was held, resulting in a vote in favor of repealing the Resolutions.

In considering the County's appeal in this case, we will address separately each form of relief sought in the County's Petition: (1) writ of mandamus; (2) declaratory judgment; and (3) writ of prohibition.

1. *Writ of Mandamus*: The County petitioned the superior court

[6] This order also denied as moot a motion filed by the Intervenor-Appellees seeking to dismiss the County's petition.

[7] On March 4, 2022, the same day the superior court issued its order, the County filed an emergency motion in the Court of Appeals seeking to prevent the probate court from certifying the results of the Referendum, and the Court of Appeals transferred the matter to this Court several days later. We denied the emergency motion on March 10, 2022. See Case No. S22M0759. On March 14, 2022, the County filed an application for Interlocutory Appeal, which we dismissed on the ground that the County was entitled to a direct appeal from the superior court's order. See Case No. S22I0782. The County's separate direct appeal was docketed in this Court and orally argued by the parties on October 6, 2022, at a special session held in Augusta, Georgia.

for a writ of mandamus pursuant to OCGA §§ 9-6-20[8] and 9-6-21,[9] asserting that it is entitled to such relief "because the constitutional provision at issue does not allow for a referendum in this circumstance." The County's petition for mandamus sought a writ commanding Judge Sweatt to "abandon his exercise of jurisdiction over the Petition"; "refrain from canvassing the returns and declaring and certifying the results of the March 8 election to the County"; "refrain from certifying the results of the March 8 election to the Secretary of State"; and "issue an order declaring the Petition

---

[8] Under OCGA § 9-6-20,

[a]ll official duties should be faithfully performed, and whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance, the writ of mandamus may issue to compel a due performance if there is no other specific legal remedy for the legal rights; provided, however, that no writ of mandamus to compel the removal of a judge shall issue where no motion to recuse has been filed, if such motion is available, or where a motion to recuse has been denied after assignment to a separate judge for hearing.

[9] OCGA § 9-6-21 (a) provides:

Mandamus shall not lie as a private remedy between individuals to enforce private rights nor to a public officer who has an absolute discretion to act or not to act unless there is a gross abuse of such discretion. However, mandamus shall not be confined to the enforcement of mere ministerial duties.

7

invalid."

> This Court has described a writ of mandamus as
>
> > an extraordinary remedy to compel a public officer to perform a required duty when there is no other adequate legal remedy. It is a discretionary remedy that courts may grant only when the petitioner has a clear legal right to the relief sought or the public official has committed a gross abuse of discretion. In general, mandamus relief is not available to compel officials to follow a general course of conduct, perform a discretionary act, or *undo a past act*.

*Gaddy v. Ga. Dept. of Revenue*, 301 Ga. 552, 561-62 (3) (802 SE2d 225) (2017) (citation and punctuation omitted; emphasis supplied). See also *R. A. F. v. Robinson*, 286 Ga. 644, 646 (1) (690 SE2d 372) (2010) ("Mandamus can be used to compel an official to exercise his or her discretion, but not to direct the manner in which that discretion is exercised." (citation and punctuation omitted)). Rather, "mandamus relief applies prospectively only. It will not lie to compel the undoing of acts already done and this is so even though the action taken was clearly [in violation of the Georgia Constitution]." *Atlanta Independent School System v. Lane*, 266 Ga. 657, 660 (6) (469 SE2d 22) (1996) (affirming denial of mandamus relief seeking

8

repayment of amounts paid by city to school district under an agreement that violated the Georgia Constitution).

Under the Home Rule Paragraph, the probate court judge's first responsibility upon receipt of a petition filed by electors for a special election is "[to] determine the validity of such petition." Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b) (2) (hereinafter "subparagraph (b) (2)"). If the judge determines that the petition is valid, "it shall be his duty to issue the call for an election for the purpose of submitting such amendment or repeal to the registered electors of the county for their approval or rejection" and to follow certain other procedures in conjunction with that election. Id.[10] If the judge determines that the petition is invalid, "he shall cause to be published in explicit detail the reasons why such petition is not valid[.]" Id. Here, Judge Sweatt determined that the Electors' Petition was valid and called the special election on February 8, 2022. The special election took place on March 8, 2022, and Judge

[10] The County does not deny that Judge Sweatt has complied with the remaining requirements and procedures of subparagraph (b) (2) with regard to the election.

9

Sweatt thereafter certified the results. On appeal, the County contends that the Superior Court should have issued a writ of mandamus to reverse the judge's determination that the Electors' Petition was valid. In other words, the County asks for a writ of mandamus commanding the judge to undo his determination and the acts that followed. Under these circumstances, we conclude that the superior court properly denied the County's petition for a writ of mandamus because it sought only to compel Judge Sweatt to undo actions he had already taken.

2. *Declaratory Judgment*: The County contends that the superior court erred in denying the declaratory relief it sought[11]

---

[11] The County sought a declaratory judgment on the following issues: [t]hat the Petition is invalid under [the Home Rule Paragraph]; [t]hat the [Referendum Order] . . . is a nullity because it was issued beyond the Probate Court's jurisdiction and in violation of the Constitution; [t]hat as a result of the nullity of the [Referendum Order], the [Referendum] is unauthorized and in contravention of the Constitution; [t]hat as a result, the County is not obligated to expend funds for an illegal election because it would violate Georgia law; [t]hat as a result, the repeal of the resolutions as would be effected by the [Referendum] will be invalid as "inconsistent" with the Constitution; [t]hat as a result, the status of the Option Contract would remain unaffected by the returns of the [Referendum] or any further action taken by the Honorable

because the Electors' Petition was not authorized under the Home

Rule Paragraph.[12]

(a) Before we address the merits of the County's argument,

however, we first consider the Intervenor-Appellees' assertion that

the County is not authorized to pursue an action for declaratory

judgment because it became a party to the probate court proceedings

---

Judge Sweatt including, but not limited [to], Judge Sweatt's further exercise of jurisdiction over the [Electors'] Petition in contravention to the writs petitioned for herein.

(Citation and paragraph numbering omitted.)

[12] Judge Sweatt argues on appeal that sovereign immunity bars a request for declaratory relief against him in his official capacity, citing *GeorgiaCarry.Org, Inc. v. Bordeaux*, 352 Ga. App. 399, 403 (3) (834 SE2d 896) (2019) (concluding that the probate judge was a public employee of the State and could assert sovereign immunity when sued in his official capacity by entity in connection with issuing a gun carry license). However, sovereign immunity does not apply to lawsuits between political subdivisions of the State because "[n]either entity retains a superior authority over the other that would prevent it from being hailed into a court of law by the other." *City of College Park v. Clayton County*, 306 Ga. 301, 311 (1) (b) (830 SE2d 179) (2019). Likewise, the County is not sovereign over Judge Sweatt, who was sued in his official capacity, nor is Judge Sweatt sovereign over the County. Rather, they stand on equal footing for purposes of sovereign immunity in this case because "a suit against a county officer in [his] official capacity *is* a suit against the county itself." *Layer v. Barrow County*, 297 Ga. 871, 871 (1) (778 SE2d 156) (2015) (emphasis in original). See also *Gilbert v. Richardson*, 264 Ga. 744, 746 (2), n. 4 (452 SE2d 476) (1994). Thus, sovereign immunity does not apply to this lawsuit. See *City of College Park*, 306 Ga. at 311 (1) (b). Judge Sweatt does not otherwise argue that he was not the appropriate respondent in the County's petition for declaratory judgment, so we express no opinion on that issue.

11

when it filed a caveat to the Electors' Petition and then failed to appeal the Referendum Order validating the petition. The Intervenor-Appellees contend that the County is barred "both as a matter of collateral estoppel and as a failure of a prerequisite to its substantive claims." We disagree.

As to collateral estoppel, and assuming without deciding that the Electors' Petition is an "action" to which the doctrine of collateral estoppel applies, the doctrine does not bar the County because the County was never a party to the probate court proceedings. "The doctrine of collateral estoppel precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the *same parties* or their privies."[13] *Copelan v. Copelan*, 294 Ga. 840, 841 (755 SE2d 739) (2014) (citation and punctuation omitted; emphasis supplied). See also *Pike County*

---

[13] "A privy is generally defined as one who is represented at trial and who is in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right." *Lilly v. Heard*, 295 Ga. 399, 404 (2) (c) (761 SE2d 46) (2014) (citation and punctuation omitted). The Intervenor-Appellees do not contend that any party involved in the probate court proceedings was the County's privy.

*v. Callaway-Ingram*, 292 Ga. 828, 832 (2) (742 SE2d 471) (2013).

Therefore, the claims of an individual or entity who was not a party to, and whose interests were not represented in, the prior action will not be barred by collateral estoppel. See *In re T. M. G.*, 275 Ga. 543, 544 (570 SE2d 327) (2002) (foster parents' claim for adoption of child not barred because they were not a party to earlier adoption proceeding with different prospective parents, nor were their interests represented by the parties to that proceeding).

This Court has defined the term "party to an action" to include "all who are directly interested in the subject matter, and who have a right to make [a] defense, control the pleadings, examine and cross-examine witnesses, and appeal from the judgment." *State Bar of Ga. v. Beazley*, 256 Ga. 561, 563 (1) (b) (350 SE2d 422) (1986).[14] See also *Smith v. Gettinger*, 3 Ga. 140, 143 (1847) (plaintiff was not a party to a prior attachment action rendered in favor of defendant

---

[14] Although this definition arose in the context of res judicata, we see no reason why the same definition would not apply equally for the doctrine of collateral estoppel. See *Butler v. Turner*, 274 Ga. 566, 568 (1) (555 SE2d 427) (2001) (both res judicata and "[t]he related doctrine of collateral estoppel . . . require[ ] the identity of the parties or their privies in both actions").

against a third party where he "had no power, in his own right, to make a defense against [the attachment], to adduce testimony, to examine witnesses, to control the proceedings, or to enter an appeal").

The County did not become a party to the probate court proceedings. As Judge Sweatt determined, even though the County filed a caveat opposing the Electors' Petition, it had no right to make a defense to the petition. The Home Rule Paragraph makes no provision authorizing a county, or any other party, to file a caveat, or any other form of opposition, to an elector's petition in the probate court. Instead, the Home Rule Paragraph provides that elections called by the probate judge under that paragraph "shall be held under the same laws and rules and regulations as govern special elections, except as otherwise provided herein." Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b) (2). OCGA § 21-2-540 (a) (1) provides that

> [e]very . . . special election shall be held and conducted in all respects in accordance with the provisions of this chapter relating to general primaries and general elections; and the provisions of this chapter relating to general primaries and general elections shall apply

14

thereto insofar as practicable and as not inconsistent with any other provisions of this chapter.

And those special election "laws and rules and regulations" make clear that the County was not a party to the probate court proceedings.

With respect to challenging an election, the statute governing contests to elections provides in pertinent part: "[T]he approval or disapproval of any question submitted to electors at an election may be contested by . . . any aggrieved elector who was entitled to vote . . . for or against such question." OCGA § 21-2-521. The statute thus limits the right to contest elections to "electors." Because the County is not an elector, it would not be authorized to contest the outcome of the special election under the Election Code. Moreover, we could not locate, and the Intervenor-Appellees do not point out, any authority in the Election Code, OCGA § 21-2-1 et seq., or otherwise that would allow the County to file a caveat or any other objection *before* an election and contest an application to submit a question to the electorate under the Home Rule Paragraph. Where there is no

15

authority for a county to participate in the petitioning for a special election under the Home Rule Paragraph, the County cannot be said to have a "direct interest" in the probate court proceedings in this case.

The conclusion that the County was not a party to the probate court proceedings also answers the Intervenor-Appellees' assertion that the County had to appeal the Referendum Order before seeking a declaratory judgment. Because the County was not a party to the probate court proceedings, it had no right to appeal the Referendum Order. See *State v. Cash*, 298 Ga. 90, 93 (1) (b) (779 SE2d 603) (2015) ("[T]he Appellate Practice Act, see OCGA §§ 5-6-30 to 5-6-51 . . . grants the right of appeal only to either party in any civil case and the defendant in any criminal proceeding." (citation and punctuation omitted)). Cf. *Davis v. Deutsche Bank Nat. Trust Co.*, 285 Ga. 22, 24 (673 SE2d 221) (2009) (trial court's ruling disposing of appellant's motion to intervene entered contemporaneously with a ruling granting summary judgment to one of the parties to the suit "does not make [appellant] a party to the suit, and does not confer

16

standing on her to appeal the grant of partial summary judgment to

one of the parties").[15] And we could locate no authority authorizing

---

[15] To the extent that the Intervenor-Appellees also argue that the County nevertheless should have moved to intervene in the probate court proceedings, the Intervenor-Appellees do not cite, nor could we find, legal authority under which the County would have been permitted to take such action. In Georgia, non-party intervention in court proceedings is governed by OCGA § 9-11-24 of Georgia's Civil Practice Act ("CPA"). However, application of the CPA is limited to "*actions of a civil nature* whether cognizable as cases at law or in equity," OCGA § 9-11-1 (emphasis supplied), or special statutory proceedings as prescribed in OCGA § 9-11-81. Georgia law governing probate court proceedings provides for intervention only in civil cases. See OCGA § 15-9-122 ("Unless provided to the contrary [under the law], the general laws and rules of practice, pleading, procedure, and evidence that are applicable to the superior courts of this state shall be applicable to and govern in *civil cases* in the probate courts." (emphasis supplied)); Uniform Probate Court Rule 2.7 (B) (allowing parties to intervene "in *civil cases* before Article 6 Probate Courts" (emphasis supplied)). While the CPA does not define "actions of a civil nature," it provides that "'[c]ivil action' means an action founded on private rights, arising either from contract or tort," OCGA § 9-2-1, and the Georgia Code defines "civil case" in the context of probate courts as "those *civil matters*" that meet certain conditions. OCGA § 15-9-120 (1) (emphasis supplied).

Here, the Electors' Petition was not based on the violation of any private right; rather, it was based on the home rule power conferred on counties under the Home Rule Paragraph and the concomitant power conferred on the electorate to amend or repeal an ordinance, resolution, or regulation adopted by a county's governing authority. Moreover, the Home Rule Paragraph describes the process by which the electorate may seek to amend or repeal certain "local acts or ordinances, resolutions, or regulations" and does not refer to the procedures set out under the CPA. Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b) (2). And although OCGA § 9-11-81 provides that the CPA's provision governing intervention, OCGA § 9-11-24, also applies to all special statutory proceedings in this state, the Home Rule Paragraph cannot be classified as establishing a "special statutory proceeding" as it arises under the Georgia Constitution, not the Georgia Code. Thus, we see no reason to characterize the Electors' Petition as a civil action or a special statutory proceeding in which

17

the County to appeal the Caveat Order. Although the Appellate Practice Act provides for direct appeals from "[a]ll judgments or orders sustaining motions to dismiss a caveat to the probate of a will," OCGA § 5-6-34 (a) (9), no similar provision exists for judgments or orders denying caveats under any other circumstances.

Accordingly, we conclude that because the County was not a party to the probate court proceedings, its claim for declaratory relief is not barred by either collateral estoppel or its failure to take further direct action with regard to those proceedings. See *Callaway-Ingram*, 292 Ga. at 832 (2) (prior litigation "did not, and could not, conclude the claims" of defendant, because she was not a party to the prior case).

(b) We turn now to the County's argument that it is entitled to declaratory relief because the special election procedures under the Home Rule Paragraph do not apply to the Resolutions in this case.

---

intervention under the CPA would apply.

To begin, we briefly review the history of home rule in Georgia. In 1965, the Georgia legislature first established home rule for local governments, by enacting the Municipal Home Rule Act of 1965, OCGA § 36-35-3 (b), and simultaneously proposing an amendment to the Georgia Constitution to provide home rule for counties, which was ratified by the state's voters in 1966. See R. Perry Sentell, Jr., The Georgia Home Rule System, 50 Mercer L. Rev. 99, 105-06 (II) (A) (1998).[16] Prior to that time, the General Assembly exercised plenary power over local government. See id. ("Few jurisdictions equaled Georgia's adamant resistance to the home rule movement. The state's historic devotion to legislative supremacy held strong for many [decades]."). As this Court has previously found and as discussed further below, the system of "home rule" for counties established under the Home Rule Paragraph confers "two

---

[16] This disparity is explained by the fact that the Georgia Constitution previously had been amended to allow for the passage of municipal home rule legislation, but the Constitution contained no such provision for counties. Therefore, the legislature's only option was to propose a constitutional amendment in order to establish home rule for counties. See Sentell, 50 Mercer L. Rev. at 110 (II) (B) (2).

'legislating' powers" to Georgia counties. *Bd. of Commrs. of Miller County v. Callan*, 290 Ga. 327, 328 (1) (a) (720 SE2d 608) (2012), quoting Sentell, 50 Mercer L. Rev. at 133 (III) (A) (4). "At the first tier, the [county's] governing authority is empowered to adopt measures for its . . . county that do not rise to the level of affecting state legislation." Id. (citation and punctuation omitted). See also Ga. Const. of 1983, Art. IX, Sec. II, Par. I (a) (permitting counties "to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which is not inconsistent with this Constitution or any local law applicable thereto") (hereinafter "subparagraph (a)"). "However, the second-tier delegation constitutes the system's most extensive grant of local legislating power; it comprises, no less, the essence of Georgia's home rule complex." *Callan*, 290 Ga. at 329 (1) (a) (cleaned up); see also Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b). Under subparagraph (b), "counties are empowered to change existing state law," *Callan*, 290 Ga. at 329 (1) (a) (cleaned up), under two separate

20

procedures. Under the first of these procedures, the County may amend or repeal "the local acts applicable to its governing authority" by a resolution or ordinance adopted by its governing authority in a two-vote procedure. Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b) (1) (hereinafter "subparagraph (b) (1)").  The second of these procedures allows the electorate to petition for a special election to amend or repeal "such local acts or ordinances, resolutions, or regulations adopted pursuant to subparagraph (a)." See Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b) (2).

It is the second of these procedures and the scope of the power given to the electorate, which is at issue in this appeal – that is, whether the use of the referendum procedure is limited to the amendment or repeal of local acts applicable to a county's governing authority, as the County contends, or whether it also allows a county's electorate to seek a referendum on the amendment or repeal of measures that are adopted by a county's governing authority pursuant to subparagraph (a), like the Resolutions authorizing the County to enter into and extend the Option

21

Agreement here. All parties agree that the referendum procedure allows the electorate to amend local acts applicable to the County's governing authority under the second-tier delegation of authority, but the County argues that the referendum procedure is limited to such local acts and that the referendum called here to overturn the Resolutions adopted by the County was unauthorized. Cf. *Kemp v. City of Claxton*, 269 Ga. 173, 175-76 (1) (496 SE2d 712) (1998) (holding that the petition procedure under Municipal Home Rule Act "applies only to amendments to municipal charters").

In analyzing this issue, we begin with the text of the Home Rule Paragraph. In conferring the first-tier delegation of legislative power to counties, that provision reads:

> The governing authority of each county shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which is not inconsistent with this Constitution or any local law applicable thereto. Any such local law shall remain in force and effect until amended or repealed as provided in subparagraph (b).

22

Ga. Const. of 1983, Art. IX, Sec. II, Par. I (a).[17] There is no dispute that subparagraph (a) authorized the Board to pass the Resolutions approving the Option Agreement and its extensions, which relate to property and the affairs of the County.

Our focus, however, is on the constitutional text addressing the second-tier delegation of legislative power, which states, in relevant part:

> Except as provided in subparagraph (c),[18] a county may, as an incident of its home rule power, amend or repeal the *local acts applicable to its governing authority* by following either of the procedures hereinafter set forth:
> (1) *Such local acts* may be amended or repealed by a resolution or ordinance duly adopted at two regular consecutive meetings of the county governing authority not less than seven nor more than 60 days apart. . . .
> (2) Amendments to or repeals of *such local acts or ordinances, resolutions, or regulations adopted pursuant to subparagraph (a)* hereof may be

---

[17] Subparagraph (a) also delineates the powers remaining to the General Assembly in light of this delegation.

[18] Subparagraph (c) of the Home Rule Paragraph contains a list of matters excluded from the legislative powers granted in subparagraphs (a) and (b), none of which are applicable in this case, and further excludes "any other matters which the General Assembly by general law has preempted or may hereafter preempt, but such matters shall be the subject of general law or the subject of local acts of the General Assembly to the extent that the enactment of such local acts is otherwise permitted under this Constitution." Ga. Const. of 1983, Art. IX, Sec. II, Par. I (c).

> initiated by a petition filed with the judge of the probate court of the county. . . .

Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b) (emphasis supplied).

In determining the meaning of this language,

> [w]e generally apply the ordinary signification to words in construing a constitutional provision. This means we afford the constitutional text its plain and ordinary meaning, view the text in the context in which it appears, and read the text in its most natural and reasonable way, as an ordinary speaker of the English language would.

*McInerney v. McInerney*, 313 Ga. 462, 464 (2) (870 SE2d 721) (2022) (citations and punctuation omitted). See also *Olevik v. State*, 302 Ga. 228, 235-36 (2) (c) (i) (806 SE2d 505) (2017) (constitutional text is interpreted "according to the original public meaning of its text," for which we consider the text's "plain and ordinary meaning" (citation and punctuation omitted)). In other words, we look "for the meaning the people understood a provision to have at the time they enacted it." *Olevik*, 302 Ga. at 235 (2) (c) (i). "And although the text is always our starting point . . . (and often our ending point, as well), the broader context in which that text was enacted may also be a critical consideration." Id. at 236 (2) (c) (i). Moreover, constitutional

24

interpretation differs from statutory interpretation in that "[o]ur objective focus is even more important when we interpret the Constitution. Unlike ordinary legislation, the people — not merely elected legislators — are the 'makers' of the Georgia Constitution." Id. at 238 (2) (c) (i).

In addition, "[i]t is a basic rule of construction that a statute [or constitutional provision] should be construed to make all its parts harmonize and to give a sensible and intelligent effect to each part, as it is not presumed that the [drafters] intended that any part would be without meaning." *McIver v. State*, 314 Ga. 109, 120 (2) (b) (875 SE2d 810) (2022) (citation and punctuation omitted). See also *McInerney*, 313 Ga. at 465 (2) ("[T]his Court must construe the Georgia Constitution to make its parts harmonize and to give sensible meaning to each of them." (citation and punctuation omitted)); *Brown v. Liberty County*, 271 Ga. 634, 635 (522 SE2d 466) (1999) (same). And it is well settled that in interpreting statutory text, "courts generally should avoid a construction that makes some language mere surplusage." *Middleton v. State*, 309 Ga. 337, 342 (3)

(846 SE2d 73) (2020) (citation and punctuation omitted). This "canon of statutory construction applies with at least equal force in the constitutional context." *Garcia-Jarquin v. State*, 314 Ga. 555, 564 (878 SE2d 200) (2022) (Bethel, J., concurring). See also *Gwinnett County School District v. Cox*, 289 Ga. 265, 271 (2) (c) (710 SE2d 773) (2011) ("Established rules of constitutional construction prohibit us from any interpretation that would render a word superfluous or meaningless.").

Applying these rules of construction to the text of the Home Rule Paragraph, we recognize that the introductory text of subparagraph (b) grants a county the authority to amend or repeal "the local acts applicable to its governing authority" by two different processes. Subparagraph (b) (1) outlines the procedure by which a county's governing authority may amend or repeal "such local acts." At the time the Home Rule Paragraph was ratified in 1966, the term "such" was defined to mean "[o]f this kind having [a] particular quality or character specified . . . . [S]uch represents the object as already particularized . . . and is a descriptive or relevant word,

26

referring to the last antecedent." Black's Law Dictionary, p. 1600 (4th ed. 1951). Thus, "such local acts" clearly refers to "the local acts applicable to its governing authority" as set out in the introductory text. But subparagraph (b) (2) sets out the procedure by which a county's electorate may seek a referendum on the amendment or repeal of "such local acts *or ordinances, resolutions, or regulations adopted pursuant to subparagraph (a)*." (Emphasis supplied.)

This language in subparagraph (b) (2) plainly grants repeal and amendment powers to the electorate for "ordinances, resolutions, or regulations adopted pursuant to subparagraph (a)" in addition to "such local acts" as referred to in the introductory text and subparagraph (b) (1). Both subparagraphs (b) (1) and (2) refer to "such local acts" and thus are consistent with the introductory text; subparagraph (b) (1) addresses only the governing authority's power to amend or repeal such local acts through a two-vote procedure. Subparagraph (b) (2), on the other hand, describes in detail a special election/referendum process to amend or repeal such local acts, as well as county ordinances, resolutions, and regulations

27

adopted by the county's governing authority under the first-tier delegation in subparagraph (a).[19] To read subparagraphs (b) (1) and (2) as granting strictly coextensive powers, as the County urges us to do, would require us to ignore the phrase "or ordinances, resolutions, or regulations adopted pursuant to subparagraph (a)" in the text of subparagraph (b) (2), a reading that would violate well-established tenets of constitutional interpretation that generally require each part of the text be given a sensible reading and not be rendered superfluous.[20] See *McIver*, 314 Ga. at 119-20 (2) (b); *Middleton*, 309 Ga. at 342 (3); *McInerney*, 313 Ga. at 464 (2).

We are unpersuaded by the County's warnings about the

---

[19] Notably, subparagraph (b) (2) does not use the term "such" when referring to "ordinances, resolutions, or regulations," which is in contrast to its use of the term "such local acts," thereby supporting that the "ordinances, resolutions, or regulations" referred to are of a different kind than "such local acts."

[20] The County also argues that "ordinances, resolutions, or regulations" in subparagraph (b) (2) may refer to law passed under the two-vote process in subparagraph (b) (1), but that argument likewise ignores critical language in subparagraph (b) (2), which references "ordinances, resolutions, or regulations *adopted pursuant to subparagraph (a)*," and not that law adopted pursuant to subparagraph (b) (1). Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b) (2) (emphasis supplied).

potential consequences of allowing the electorate to amend or repeal ordinances, resolutions, or regulations. The County urges that the Secretary of State may be compelled to publish all such amendments under subparagraph (g)[21] of the Home Rule Paragraph; but that subparagraph on its face applies only to local acts, which, as discussed above, are distinct from ordinances, resolutions, or regulations. The County also warns that allowing the electorate to amend or repeal acts of a county's governing authority could lead to a perpetual cycle of the same act being passed by the county and repealed by the electorate. But there is little evidence that such a parade of horribles would occur, given that a county's governing authority, which is comprised of elected officials, would be unlikely

---

[21] That subparagraph provides:

No amendment or revision of any *local act* made pursuant to subparagraph (b) of this section shall become effective until a copy of such amendment or revision, a copy of the required notice of publication, and an affidavit of a duly authorized representative of the newspaper in which such notice was published to the effect that said notice has been published as provided in said subparagraph has been filed with the Secretary of State. The Secretary of State shall provide for the publication and distribution of all such amendments and revisions at least annually.

Ga. Const. of 1983, Art. IX, Sec. II, Par. I (g) (emphasis supplied).

to routinely disregard the will of the electorate and given that subparagraph (b) (2) provides that "[a] referendum on any such amendment or repeal shall not be held more often than once each year." In any event, even if such a scenario were to occur, we are bound to apply the plain meaning of the constitutional provision.

We conclude, therefore, giving effect to all parts of the text, that the Home Rule Paragraph authorized the County's electorate to petition for the repeal of the Resolutions and that Judge Sweatt was authorized to consider the Electors' Petition to determine whether it met the requirements under that provision for obtaining a referendum on the issue.

We recognize that our holding here is in tension with *Kemp*, 269 Ga. at 175-76 (1), in which we construed the statutory home rule provisions applicable to municipalities under the Municipal Home Rule Act. That act contains a provision somewhat similar to subparagraph (b) of the Home Rule Paragraph and states that "a municipal corporation may, as an incident of its home rule power, amend its charter by following either of [two] procedures." OCGA §

30

36-35-3 (b). One of the prescribed procedures provides that

> [a]mendments to charters or amendments to or repeals of ordinances, resolutions, or regulations adopted pursuant to subsection (a) of this Code section may be initiated by a petition, filed with the governing authority of the municipal corporation . . . .

OCGA § 36-35-3 (b) (2) (A).

In *Kemp*, we determined that in granting a writ of mandamus to compel consideration of a petition to repeal a city ordinance under the Municipal Home Rule Act, the trial court had erroneously relied upon "the reference to 'amendments to or repeals of ordinances, resolutions, or regulations,' found in OCGA § 36-35-3 (b) (2) (A)." *Kemp*, 269 Ga. at 176 (1). Reasoning that "the very concept of home rule suggests that the provisions of (b) (2) apply only to charter amendments," the Court determined that because "[a]ll of OCGA § 36-35-3 (b) is prefaced by a statement that what follows are the methods by which a municipal corporation may 'amend its charter,'" the introductory language showed "that the petition and referendum provision is intended to be available only when the proposed amendment is intended to affect a city charter." Id. Accordingly, the

Court reversed the grant of mandamus, holding "[a]s we must strictly construe the grant of legislative power to the governing authority, [the Court] must reject plaintiffs' argument that the electorate can directly exercise such general legislative power," and that "[t]he petition procedure of OCGA § 36-35-3 (b) (2) applies only to amendments to municipal charters." Id.

Because, here, we are construing a completely separate legal provision, the holding in *Kemp* does not control our decision in this case,[22] and we need not consider at this time whether *Kemp* should be overruled in light of today's ruling. Nevertheless, we note that in reaching the holding in *Kemp*, this Court dismissed some of the canons of construction we apply in this case, stating, instead, that "the spirit and intent of the legislation prevails over a literal reading

---

[22] Moreover, because *Kemp* was decided in 1998, more than 30 years after the ratification of the Home Rule Paragraph in 1966 and more than 15 years after the 1982 ratification of the current Georgia Constitution, in which that provision was carried forward, *Kemp*'s interpretation of the similar language of the Municipal Home Rule Act forms no part of the legal context in which the Home Rule Paragraph was adopted. Cf. *Olevik*, 302 Ga. at 236 (2) (b) (i) (part of the broader context in which we consider constitutional text is "the body of pre-enactment decisions of this Court interpreting the meaning of . . . text that the framers of our Constitution subsequently chose to use").

of the language," and "[t]he legislative intent will be effectuated even if some language must be eliminated." *Kemp*, 269 Ga. at 175-76 (1).

Accordingly, we affirm the superior court's denial of the County's petition for declaratory relief.

3. *Writ of Prohibition*: The County also sought a writ of prohibition against Judge Sweatt on the grounds that he lacked authority and jurisdiction to call for the special election. See OCGA §§ 9-6-40,[23] 9-6-41,[24] and 9-6-42.[25]

A writ of prohibition seeks "to prevent a tribunal possessing

---

[23] OCGA § 9-6-40 provides:
> The writ of prohibition is the counterpart of mandamus, to restrain subordinate courts and inferior judicial tribunals from exceeding their jurisdiction where no other legal remedy or relief is given. The granting or refusal thereof is governed by the same principles of right, necessity, and justice as apply to *mandamus*; provided, however, that no writ of prohibition to compel the removal of a judge shall issue where no motion to recuse has been filed, if such motion is available, or where a motion to recuse has been denied after assignment to a separate judge for hearing.

(Emphasis supplied.)

[24] Under OCGA § 9-6-41, a "writ of prohibition may be granted at any time, on proper showing made."

[25] "The writ of prohibition will not lie to the duly inaugurated Governor, but it lies to all other executive or military officers when acting as a judicial or quasi-judicial tribunal." OCGA § 9-6-42.

judicial powers from exercising jurisdiction over matters not within its cognizance, or from exceeding its jurisdiction in matters of which it has cognizance." *Stokes v. Edwards*, 272 Ga. 98, 98-99 (526 SE2d 853) (2000) (citation and punctuation omitted). Therefore, this remedy "is available only where the court sought to be restrained lacks subject-matter jurisdiction or acts in excess of its jurisdiction [.]" Id. at 99. See also *Ray v. Jolles*, 280 Ga. 452, 453-54 (629 SE2d 250) (2006) (affirming denial of writ of prohibition where probate court had subject-matter jurisdiction and acted within its authority).

The County argues that Judge Sweatt exceeded his jurisdiction in addressing the Electors' Petition because the Resolutions were not subject to amendment or repeal under the special election process set out in the Home Rule Paragraph. That argument is unavailing, however, because, as discussed in Division 2 (b), we conclude that the Home Rule Paragraph authorized Camden County electors to pursue a referendum seeking repeal of the Resolutions in this case. Accordingly, Judge Sweatt acted within the probate court's subject-matter jurisdiction and the authority granted under the

34

Home Rule Paragraph in calling for the Referendum, and the superior court was correct in denying the County's petition for a writ of prohibition.

*Judgment affirmed. All the Justices concur.*

## Appendix I

Home rule for counties.

(a) The governing authority of each county shall have legislative power to adopt clearly reasonable ordinances, resolutions, or regulations relating to its property, affairs, and local government for which no provision has been made by general law and which is not inconsistent with this Constitution or any local law applicable thereto. Any such local law shall remain in force and effect until amended or repealed as provided in subparagraph (b). This, however, shall not restrict the authority of the General Assembly by general law to further define this power or to broaden, limit, or otherwise regulate the exercise thereof. The General Assembly shall not pass any local law to repeal, modify, or supersede any action taken by a county governing authority under this section except as authorized under subparagraph (c) hereof.

(b) Except as provided in subparagraph (c), a county may, as an incident of its home rule power, amend or repeal the local acts applicable to its governing authority by following either of the procedures hereinafter set forth:

(1) Such local acts may be amended or repealed by a resolution or ordinance duly adopted at two regular consecutive meetings of the county governing authority not less than seven nor more than 60 days apart. A notice containing a synopsis of the proposed amendment or repeal shall be published in the official county organ once a week for three weeks within a period of 60 days immediately preceding its final adoption. Such notice shall state that a copy of the proposed amendment or repeal is on file in the office of the clerk of the superior court

of the county for the purpose of examination and inspection by the public. The clerk of the superior court shall furnish anyone, upon written request, a copy of the proposed amendment or repeal. No amendment or repeal hereunder shall be valid to change or repeal an amendment adopted pursuant to a referendum as provided in (2) of this subparagraph or to change or repeal a local act of the General Assembly ratified in a referendum by the electors of such county unless at least 12 months have elapsed after such referendum. No amendment hereunder shall be valid if inconsistent with any provision of this Constitution or if provision has been made therefor by general law.

(2) Amendments to or repeals of such local acts or ordinances, resolutions, or regulations adopted pursuant to subparagraph (a) hereof may be initiated by a petition filed with the judge of the probate court of the county containing, in cases of counties with a population of 5,000 or less, the signatures of at least 25 percent of the electors registered to vote in the last general election; in cases of counties with a population of more than 5,000 but not more than 50,000, at least 20 percent of the electors registered to vote in the last general election; and, in cases of a county with a population of more than 50,000, at least 10 percent of the electors registered to vote in the last general election, which petition shall specifically set forth the exact language of the proposed amendment or repeal. The judge of the probate court shall determine the validity of such petition within 60 days of its being filed with the judge of the probate court. In the event the judge of the probate court determines that such petition is valid, it shall be his

duty to issue the call for an election for the purpose of submitting such amendment or repeal to the registered electors of the county for their approval or rejection. Such call shall be issued not less than ten nor more than 60 days after the date of the filing of the petition. He shall set the date of such election for a day not less than 60 nor more than 90 days after the date of such filing. The judge of the probate court shall cause a notice of the date of said election to be published in the official organ of the county once a week for three weeks immediately preceding such date. Said notice shall also contain a synopsis of the proposed amendment or repeal and shall state that a copy thereof is on file in the office of the judge of the probate court of the county for the purpose of examination and inspection by the public. The judge of the probate court shall furnish anyone, upon written request, a copy of the proposed amendment or repeal. If more than one-half of the votes cast on such question are for approval of the amendment or repeal, it shall become of full force and effect; otherwise, it shall be void and of no force and effect. The expense of such election shall be borne by the county, and it shall be the duty of the judge of the probate court to hold and conduct such election. Such election shall be held under the same laws and rules and regulations as govern special elections, except as otherwise provided herein. It shall be the duty of the judge of the probate court to canvass the returns and declare and certify the result of the election. It shall be his further duty to certify the result thereof to the Secretary of State in accordance with the provisions of subparagraph (g) of this Paragraph. A referendum on any such amendment or repeal shall not be held more often than once each

year. No amendment hereunder shall be valid if inconsistent with any provision of this Constitution or if provision has been made therefor by general law.

In the event that the judge of the probate court determines that such petition was not valid, he shall cause to be published in explicit detail the reasons why such petition is not valid; provided, however, that, in any proceeding in which the validity of the petition is at issue, the tribunal considering such issue shall not be limited by the reasons assigned. Such publication shall be in the official organ of the county in the week immediately following the date on which such petition is declared to be not valid.

(c) The power granted to counties in subparagraphs (a) and (b) above shall not be construed to extend to the following matters or any other matters which the General Assembly by general law has preempted or may hereafter preempt, but such matters shall be the subject of general law or the subject of local acts of the General Assembly to the extent that the enactment of such local acts is otherwise permitted under this Constitution:

(1) Action affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority.

(2) Action affecting the composition, form, procedure for election or appointment, compensation, and expenses and allowances in the nature of compensation of the county governing authority.

(3) Action defining any criminal offense or providing for criminal punishment.

(4) Action adopting any form of taxation beyond that authorized by law or by this Constitution.

(5) Action extending the power of regulation over any business activity regulated by the Georgia Public Service Commission beyond that authorized by local or general law or by this Constitution.

(6) Action affecting the exercise of the power of eminent domain.

(7) Action affecting any court or the personnel thereof.

(8) Action affecting any public school system.

(d) The power granted in subparagraphs (a) and (b) of this Paragraph shall not include the power to take any action affecting the private or civil law governing private or civil relationships, except as is incident to the exercise of an independent governmental power.

(e) Nothing in subparagraphs (a), (b), (c), or (d) shall affect the provisions of subparagraph (f) of this Paragraph.

(f) The governing authority of each county is authorized to fix the salary, compensation, and expenses of those employed by such governing authority and to establish and maintain retirement or pension systems, insurance, workers' compensation, and hospitalization benefits for said employees.

(g) No amendment or revision of any local act made pursuant to subparagraph (b) of this section shall become effective until a copy of such amendment or revision, a copy of the required notice of publication, and an affidavit of a duly authorized representative of the newspaper in which such notice was published to the effect that said notice has been published as provided in said subparagraph has been filed with the Secretary of State. The Secretary of State shall provide for the publication and distribution of all such amendments and revisions at least annually.

Ga. Const. of 1983, Art. IX, Sec. II, Par. I.

BETHEL, Justice, concurring dubitante.

I am satisfied that the Court has carefully, faithfully, and accurately applied the proper tools and framework to determine the meaning of the petition and referendum provisions of subparagraph (b) (2) of the Home Rule Paragraph in our Constitution. Nevertheless, I am thoroughly uncertain that the meaning we thus discern is what the people intended when they included the Home Rule Paragraph in the Constitution. My uneasiness is compounded by the fact that the structure of the paragraph itself is decidedly unhelpful. Moreover, I have concerns about the burden this interpretation will place on Georgia's counties and, in due time, municipalities. But, in our system of limited government, our duty is to hold parties to the language they use and not to save them from it. Thus, my concurrence is given albeit with significant doubt and discomfort.

As explained in the opinion of the Court, the Home Rule

Paragraph was crafted by the General Assembly and incorporated into the State Constitution by a vote of the people to give certain legislative powers to counties so that the counties would have greater power to manage their own affairs. The General Assembly made a nearly identical provision for Georgia's municipalities through statutory measures. See OCGA § 36-35-3. Both constitutional home rule for counties and statutory home rule for municipalities include a virtually identical petition and referendum mechanism that is the focus of the case before us. Our first effort at interpreting this language in the context of the municipal home rule statute led us to a conclusion opposite of the one we reach today. See generally *Kemp v. City of Claxton*, 269 Ga. 173 (496 SE2d 712) (1998). The absence of any discernible effort to change the rule after its articulation in *Kemp* leads me to believe that the rule articulated there may be the rule desired by, or at least acceptable to, the people and their legislative representatives.

Moreover, as the majority notes, these home rule measures were adopted against the backdrop of a state legislature with a

42

reputation for being stridently opposed to implementing home rule provisions. See R. Perry Sentell, Jr., The Georgia Home Rule System, 50 Mercer L. Rev. 99, 105-106 (II) (A) (1998). The interpretation we provide today, however, seems to open a very broad path to extensive efforts outside the control of the General Assembly to tinker with the day-to-day operational decisions of local governments that seems at odds with what we might have expected to be a limited experiment in home rule. Instead, Georgia appears to have chosen to allow for petition and referendum challenges to virtually every decision of local governments. This would constitute a giant leap toward what nears a direct democracy model for local government. Of course, it is not inconceivable to imagine that the legislature's hostility to home rule was really rooted in a distrust of local elected officials rather than an aversion to ceding any of the legislature's own power to the counties. If that was the case, then allowing home rule with a strong check from the local citizenry via the petition and referendum process may not seem so odd. But the lack of contemporaneous evidence of that understanding makes that

explanation seem unlikely to me.

To say that the constitutional Home Rule Paragraph has drafting problems is kind. The structure of subparagraph (b) also adds to my doubt about our resolution of the question before us. It is quite confounding that the initial text of subparagraph (b) indicates that the subparagraph will provide for the methods of amending or repealing "the local acts applicable to its governing authority" only to have the provisions of (b) (2) provide for the ability to amend or repeal a much broader and materially different set of actions by the local government. Additional concern is generated by the provisions of subparagraph (g), which provides that an "amendment or revision of any *local act* made pursuant to subparagraph (b)" will not be effective until certain filings are made with the Secretary of State and requires that the Secretary of State subsequently provide for at least annual publication and distribution of the amendment or revision. (Emphasis supplied.) Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b). This subparagraph can only be reasonably understood to apply to changes to local acts

44

applicable to the governing authority of the county. It makes no allowance for referenda related to operational decisions. But subparagraph (b) (2), which encompasses more than "local acts," requires the probate judge to certify the results of the election on the referendum "to the Secretary of State in accordance with the provisions of subparagraph (g)[.]" Ga. Const. of 1983, Art. IX, Sec. II, Par. I (b). The majority acknowledges that subparagraph (g) "on its face applies only to local acts, which, as discussed above, are distinct from ordinances, resolutions, or regulations." But what, exactly, the Secretary of State is supposed to do with that certification when it does not relate to local acts applicable to the governing authority remains an open question. I will not delve further into the tangle. I only note that the clumsiness of the structure casts doubt on the true meaning of the text.[26]

---

[26] As a former member of both a city council and the General Assembly, I appreciate the challenges of the drafting process and the many ways confusing language and structure can make their way into language ultimately adopted by a legislative body. The structure we find here, however, should serve as an encouragement to all those involved in the drafting process to continually look at the document as a whole to ensure clarity. Regrettably,

The next chapter in this story could be challenging. Our reading of the language here, of course, signals a looming stare decisis analysis for our holding in *Kemp*. Whatever the result of that analysis may be, our holding here will, I expect, usher in a frightful season for local governments in Georgia. While getting 10-25 percent of registered voters (depending on population) to sign a petition to force a referendum should not be described as "easy," it will undoubtedly prove more realistic for those who are concerned about matters related to local alcohol ordinances, zoning ordinances and decisions, taxation rates, and budgeting decisions than it might be to collect sufficient signatures to challenge the structural "governing authority" questions otherwise found in subparagraph (b). I worry that a considerable minority group or groups within a community will be empowered to regularly subject their local

---

what we are left with in subparagraph (b) is the equivalent of a provision that indicates it will provide travel directions to Atlanta, only to include directions to Darien, Dalton, Hahira, and Hiawassee, as well. The reader is left to wonder whether the error was in the description of the contents or in the contents themselves.

community to the expense of a series of referenda as a means of either protest or in an attempt to thwart the will of a fatigued majority in a low turnout election.[27] I hope I am wrong.

Nevertheless, despite my doubts, I am compelled to concur. But it is not because the Court reaches the outcome I prefer. And it is not because I believe my concerns will prove to be unfounded. Rather, I concur because we exercise only judicial power and that power is limited. Here, that power extends to a determination of the meaning and impact of words the people ratified as the framework by which they consent to be governed. The interpretation the Court reaches is not beyond critique. Indeed, the confusing nature of the operative language might afford many readings. But, the Court has reached the most plausible reading that gives the greatest effect to the language in the document. All competing readings I have identified have greater challenges and deficiencies than the one we reach today. So, I concur, dubitante.

---

[27] How hard will it be to collect signatures on a petition to repeal the adoption of a resolution increasing or merely setting the millage rate?

I am authorized to state that Chief Justice Boggs joins in this concurrence.

Decided February 7, 2023.

Home Rule Provision; constitutional question. Camden Superior Court. Before Judge Scarlett.

*John S. Myers; Hall Booth Smith, William B. Carver, Sr., Russell A. Britt, Pearson K. Cunningham*, for appellant.

*Walker Hulbert Gray & Moore, Kellye C. Moore; Ellis Painter Ratterree & Adams, Dana F. Braun, Kimberly C. Butler, Philip M. Thompson*, for appellees.

*Clare R. Norins; Larry W. Ramsey, Jr., G. Joseph Scheuer*, amici curiae.